```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------X
ANDREA B. COATS,                          :
                                          :    04 CIV. 7570 (DLC)
                    Plaintiff,            :
                                          :    OPINION & ORDER
         -v-                              :
                                          :
MICHAEL O. LEAVITT, Administrator,        :
ENVIRONMENTAL PROTECTION AGENCY,          :
                                          :
                    Defendant.            :
-----------------------------------------X
```

APPEARANCES:

For Plaintiff Coats:
Michael H. Sussman
P.O. Box 1005
Goshen, NY 10924

For Defendant Leavitt:
Lara K. Eshkenazi, Esq.
Assistant United States Attorney
Office of the United States Attorney
Southern District of New York
86 Chambers Street, 4th Floor
New York, NY 10007

DENISE COTE, District Judge:

This Opinion addresses a discrimination claim by a plaintiff who admits that her employer used valid criteria in making a promotion decision. Plaintiff Andrea B. Coats ("Coats") has brought this Title VII employment discrimination case against her employer, Michael O. Leavitt ("Leavitt"), Administrator of the Environmental Protection Agency ("EPA"). In March 2002, Coats, an African American GS 12-level environmental engineer at the EPA, applied for a promotion to a GS 13-level position ("position"). In April 2002, the promotion was granted to Karen

1

O'Brien ("O'Brien"), a Caucasian.  Coats claims that she was
discriminated against based on race.  Leavitt has moved for
summary judgment.  For the following reasons, the motion is
denied.

Background

The following facts are undisputed or taken in the light
most favorable to the plaintiff, unless otherwise indicated.
Plaintiff Coats is a 41-year-old African American female, who has
been employed by the EPA as an environmental engineer since
February 1987.  Coats has a bachelor's degree in chemical
engineering and a master's degree in environmental engineering
from the New Jersey Institute of Technology.  As an environmental
engineer, plaintiff is responsible for writing permits that
regulate the discharge of chemicals at waste water treatment
plants and drinking water plants, primarily in Puerto Rico.  She
is also regional coordinator of the Concentrated Animal Feeding
Operations ("CAFO") program, which deals with regulations
governing facilities that house dairy animals.

Coats was originally hired by the EPA as a GS-5 level
federal employee.  She received standard annual promotions until
she reached the grade of GS-12.  Beyond GS-12, promotions are
competitive, and Coats has not been promoted to the next grade.

In 1996, Philip Sweeney ("Sweeney") began supervising
Coats's work at the EPA.  In 1998, Karen O'Brien, a Caucasian,
joined the EPA and began working under Sweeney's supervision.

O'Brien took over the New Jersey portion of the CAFO program, although Coats retained her responsibilities as regional administrator and continued to manage the New York and Puerto Rico portions of the program. Meanwhile, O'Brien led the region in a storm water program, through which she had access to training in statistics and computer modeling. In addition, O'Brien was often designated to fill in for Sweeney when he was out of the office. Coats was given this responsibility less frequently.

On March 1, 2002, the EPA issued an Inspector Vacancy Announcement regarding the GS-13 position of Water Quality Permitting Expert for Region 2, which had been vacant for over a year. The EPA designated Sweeney as the selecting official for the position. Prior to the announcement, Sweeney, in conjunction with the Human Resources Branch Staff, developed an electronic questionnaire and weighting system that would automatically rank the applicants for the position.

Coats completed the electronic questionnaire during the two-week submission period. At the end of this period, Sweeney was given the names of the six candidates who had received the highest scores on the questionnaire: plaintiff (African American), Joseph Cardile (Caucasian), Jerry Ciotola (Caucasian), Karen O'Brien (Caucasian), Thuan Tran (Asian), and Stephen Venezia (Caucasian). Tran subsequently removed his name from consideration before he could be further evaluated.

Sweeney then reviewed the electronic questionnaire responses and developed a standardized set of questions to ask the five remaining candidates during individual interviews. The questions focused on three areas: (1) general engineering and scientific education and knowledge, including overall Clean Water Act knowledge; (2) specific National Pollutant Discharge Elimination System ("NPDES") water quality-based permitting knowledge and skills, including related technical and statistical capabilities; and (3) writing and communication skills.

Sweeney took notes during each interview. Afterward, he wrote a summary evaluation of each applicant, noting his assessment of the candidate's strengths and weaknesses. In April 2002, Sweeney designated O'Brien to fill the position.

The following month, Coats wrote a memo to Sweeney questioning his reasons for not selecting her for the position and suggesting that the decision was "based upon racial preference." On June 28, 2002, Sweeney responded to plaintiff via e-mail, describing his assessments of Coats and O'Brien. Sweeny wrote that Coats was "generally strong" in the area of general scientific and engineering knowledge, as well as knowledge of the Clean Water Act. He said that he viewed her as "somewhat weaker" in the area of NPDES water quality-based permitting knowledge and related technical and statistical capabilities. Sweeney described Coats as possessing "mid-range" writing and communication skills. Sweeney then listed three "concerns" regarding Coats's performance during the interview:

4

she failed to discuss an issue related to NPDES regulations; she did not address statistical approaches commonly used in water quality-based permitting; and she did not display significant experience or skill with spreadsheets, databases, or sophisticated water quality models.  Sweeney said that O'Brien had "demonstrated a higher degree of knowledge and skill" in those areas.  He also said that in making his decision, he had taken into account his past experience supervising the candidates, and specifically noted that Coats had not completed an assignment dealing with Caribbean Petroleum Refining discharge data.

On July 26, 2002, plaintiff filed an Equal Employment Opportunity ("EEO") complaint, challenging her non-selection for the position on the ground of race discrimination, and making similar charges about two other incidents that are not before this Court.  Plaintiff filed her complaint with this Court on September 24, 2004.

Discussion

Summary judgment may not be granted unless all of the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Rule 56(c), Fed. R. Civ. P.  The moving party bears the burden of demonstrating the absence of a material fact question, and in making this determination, the court must view all facts in the light most favorable to the non-

5

moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). When the moving party has asserted facts showing that the non-movant's claims cannot be sustained, the opposing party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on the "mere allegations or denials" of the movant's pleadings. Rule 56(e), Fed. R. Civ. P.; accord Burt Rigid Box, Inc. v. Travelers Property Cas. Corp., 302 F.3d 83, 91 (2d Cir. 2002).

Plaintiff alleges that defendant discriminated against her on the basis of her race, in violation of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. ("Title VII"). Claims of employment discrimination brought pursuant to Title VII are analyzed under the burden-shifting approach set forth in McDonnell-Douglas Corp. v. Green, 411 U.S. 792, 802-03 (1973). The plaintiff bears the initial burden of establishing a prima facie case of discrimination. Williams v. R. H. Donnelly Corp., 368 F.3d 123, 126 (2d Cir. 2004). To satisfy this burden, a plaintiff alleging discrimination must establish that

> (1) [s]he is a member of a protected class; (2) [s]he is competent to perform the job or is performing [her] duties satisfactorily; (3) [s]he suffered an adverse employment decision or action; and (4) the decision or action occurred under circumstances giving rise to an inference of discrimination based on [her] membership in the protected class.

Dawson v. Bumble & Bumble, 398 F.3d 211, 216 (2d Cir. 2005) (citation omitted).

6

A plaintiff's burden in presenting prima facie evidence is de minimis. Abdu-Brisson v. Delta Airlines, Inc., 239 F.3d 456, 467 (2d Cir. 2001).

Here, Coats has established a prima facie case of discrimination. As an African American, she is a member of a protected class. It is undisputed that she has performed satisfactorily in her current position. And she was passed over for a promotion, despite having a longer tenure at the EPA and more experience writing water quality-based permits than the Caucasian candidate who was selected for the job.

The establishment of a prima facie case "creates a presumption that the employer unlawfully discriminated, and thus places the burden of production on the employer to proffer a nondiscriminatory reason for its action." James v. New York Racing Ass'n, 233 F.3d 149, 154 (2d Cir. 2000)(citation omitted); see also Mandell v. County of Suffolk, 316 F.3d 368, 380 (2d Cir. 2003). Leavitt has articulated a nondiscriminatory rationale for selecting O'Brien for the position, namely, that O'Brien provided stronger answers than plaintiff to some interview questions and possessed greater statistical and computer programming skills. Sweeney's contemporaneous interview notes, as well as his subsequent e-mail to Coats explaining the selection, are consistent with this rationale.

As a result of defendant's nondiscriminatory explanation of the promotion decision, the presumption of unlawful discrimination "drops out of the picture." James, 233 F.3d at

7

154 (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 510 (1993)). The burden shifts back to plaintiff to adduce admissible evidence of defendant's intentional discrimination against her. James, 233 F.3d at 154; see also Reeves v. Sanderson Plumbing Prod., 530 U.S. 133, 153 (2000). To defeat summary judgment, "the plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the 'motivating' factors." Back v. Hastings on Hudson Union Free Sch. Dist., 365 F.3d 107, 123 (2d Cir. 2004) (citation omitted).

"[T]he employer will be entitled to summary judgment . . . unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination." James, 233 F.3d at 154. If such evidence does not include more than conclusory statements, speculation, or general attacks on the defendant's credibility, the motion for summary judgment will be granted. Crawford El v. Britton, 523 U.S. 574, 600 (1998); Opals on Ice Lingerie v. Body Lines, 320 F.3d 362, 370 n.3 (2d Cir. 2003).

Plaintiff has conceded that the defendant chose valid criteria on which to base his selection, and has admitted to essentially all of the facts that defendant asserts were material to his decision. At her deposition, Coats agreed that Sweeney's interview questions, which focused on three areas of knowledge and experience, were relevant to the position for which she was

8

applying. Coats agreed with Sweeney's view that she was "strong" in the area of general scientific education and knowledge, and knowledge of the Clean Water Act, but "somewhat weaker" in the area of NPDES water quality-based permitting knowledge and related technical capabilities. Although Coats testified that she disagreed with Sweeney's view that she possessed "mid-range" writing and communication skills, she conceded that her written permitting work contained so many errors that she had recommended that another person be assigned to proofread it before she submitted it to Sweeney. Sweeney had rejected her suggestion.

Plaintiff's testimony also does not contradict Sweeney's assessment of other weaknesses in Coats's application. Coats stated that prior to her interview she had "never worked ... directly" with computer models and had only "assisted" on work involving spreadsheets. She also testified that she had not previously used statistics on the job. When asked about Sweeney's comment that Coats had not identified and discussed a regulatory issue during her interview, Coats said only, "I think we talked about it a little bit." Finally, Coats does not dispute that she failed to complete a Caribbean Petroleum Refining assignment by the deadline Sweeney set for the project.[1] Plaintiff's own testimony, then, is consistent with Sweeney's evaluation of her qualifications. And she has introduced no

---

[1] Plaintiff takes issue with the fact that Sweeney stated in his June 28 e-mail that Coats "did not complete" the Caribbean Petroleum Refining project. Although Coats claims that she completed the project, she admits that she did not do so on time.

9

evidence to contradict Sweeney's assessment of O'Brien's skills or experience.  At the time of her promotion, O'Brien held a bachelor's degree in civil engineering, and a masters degree in environmental engineering, both from Cooper Union.  In addition, she had over three years of experience at the EPA and had spent more than two years in the environmental planning division of a private architectural and engineering firm.

Although Coats has not presented evidence that raises a question of fact regarding the validity of the criteria that Sweeney asserts he applied in making the promotion decision, she has pointed to evidence that she argues would permit a jury to find that Sweeney was biased in his application of those criteria.  Coats contends that the questions Sweeney asked during the interviews were engineered to highlight O'Brien's strengths, particularly in statistics and computer applications.  Plaintiff conceded in her deposition testimony, however, that all of Sweeney's questions were relevant to the position.  Furthermore, Coats indicated in her responses to the automated questionnaire that she <u>had</u> performed statistical analyses and processed data using computer models.  Although plaintiff admitted at her deposition that she did not actually have such experience, given Coats's representations on the questionnaire, her contention that Sweeney inquired into the candidates' experience in these areas in order to disadvantage Coats is unsupported by the evidence.

Coats next claims that Sweeney "overlooked [O'Brien's] dilatory functioning" on a portion of the CAFO project.  She

claims that New Jersey missed a federal CAFO deadline while O'Brien was in charge of the program for the state. But plaintiff has not supported her allegation that the delay was O'Brien's fault with anything other than her own speculation.

Coats also argues that Sweeney "under-valued plaintiff's relevant contributions, including her experience with water permitting, her work on national level projects (CAFO), her inter-action with state and local agencies," and her experience writing water quality permits. She further claims that Sweeney gave undue weight to O'Brien's knowledge of a computer system and to O'Brien's possession of a professional engineer's license that was "not required for the promotion or possessed by the vast majority of those serving in GS-13 positions."[2]

Standing alone, however, these allegations are insufficient to defeat summary judgment. It is well established that "it is not the function of the fact-finder to second-guess business decisions." Dister v. Continental Group, Inc., 859 F.2d 1108, 1116 (2d Cir. 1988). Assessing the relative qualifications of candidates for a promotion requires substantial business judgment; therefore, this is precisely the sort of decision in which courts do not intervene without evidence that the employer's claimed reason was "so lacking in merit as to call into question its genuineness." Id. As Coats rightly points

---

[2] Sweeney has not advanced O'Brien's license as a justification for his decision. He mentioned it once in his 2003 statement to the EPA Investigator, although he did not emphasize it (it appears on page seven of his 11-page affidavit).

11

out, "[t]he distinction lies between a poor business decision and a reason manufactured to avoid liability." Id.

To raise a question of fact as to whether Sweeney's weighing of the candidates' qualifications was infected with bias and whether he has manufactured a description of his reasons for preferring O'Brien over her, Coats has largely relied on incidents that occurred before O'Brien's promotion. Coats alleges that Sweeney gave O'Brien preferential work assignments and training in order to buttress O'Brien's application for the position. Coats points to O'Brien's position as regional program lead for the "storm water project, which allowed [her] access to training in statistics and computer modeling for which she was credited in the promotional process." Coats also highlights Sweeney's decision to "carve[] out" the New Jersey portion of her CAFO responsibilities and hand them over to O'Brien. During the relevant time period, however, Sweeney allowed both Coats and O'Brien to lead projects -- Coats on CAFO, and O'Brien on the storm water project. Further, Coats never requested that she be assigned to a project involving statistics or computer models, nor did she apply for agency-offered training on the use of spreadsheets. In addition, O'Brien's assignment to CAFO was required by the funding initiative under which she was hired. Sweeney continued to have O'Brien manage the CAFO project in New Jersey after the required period, saying O'Brien had developed a base of relevant knowledge. Although plaintiff argues that she knew more about "New Jersey issues" than O'Brien, her subjective

12

perception of their relative qualifications does not raise a question of fact sufficient to rebut the EPA's non-discriminatory explanation of the promotion.[3]

Coats also claims that the position was held open for O'Brien until she could accumulate the requisite credentials for the job. Coats has presented no evidence, however, other than her own speculative assertions, to contradict Sweeney's statement that the delay in filling the vacancy was caused by his other work obligations and his need to learn how to use the automated system that administered the initial questionnaire. It is well established that conclusory statements of the type offered by plaintiff will not defeat a motion for summary judgment. Opals, 320 F.3d at 370 n.3 (2d Cir. 2003).

Coats does, however, raise factual questions with respect to Sweeney's decisions regarding training and discipline. First, Coats claims that she was "denied training opportunities" by Sweeney. Plaintiff points to a single instance in which Sweeney did not inform her of a training program related to CAFO. She later received a call from "the state" inquiring whether she would attend. Sweeney asserts that he did not believe the training program was important.

---

[3] Plaintiff also charges that she was "disallowed from running the section while Sweeney was out," while O'Brien was "repeatedly" given this assignment. Coats contradicted this assertion in her deposition, however, stating that she did cover for Sweeney during absences, although not as frequently as O'Brien did. Further, Coats has not produced any evidence to indicate that a candidate's service in this capacity was considered in making promotions.

13

Second, and more significantly, Coats argues that Sweeney attempted to discredit her application for the position by baselessly deeming her Absent Without Leave ("AWOL") twice in September and November of 2001. These actions were taken while the GS-13 position was vacant and at a time when Sweeney expected Coats to apply to fill the vacancy. If Coats is able to show that disciplinary actions or training programs were administered in a racially discriminatory manner -- allegations that Sweeney denies -- then this may be relevant evidence of his bias against Coats on account of her race. Should the jury determine that Sweeney was biased, it could conclude that bias caused him to balance the criteria that he used to fill the vacant position in a way that unfairly disadvantaged Coats and discriminated against her.

Conclusion

For the reasons discussed above, summary judgment is denied.

SO ORDERED:
Dated:   New York, New York
         January 31, 2006

---
DENISE COTE
United States District Judge